UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **CHESAPEAKE OPERATING INC.,** | § | |
| **Third Party Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-09-47** |
| | § | |
| **BILLY ARNOLD d/b/a** | § | |
| **RANGER OIL & GAS,** | § | |
| **Third Party Defendant.** | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an interpleader action brought by Chesapeake Operating, Inc. ("Chesapeake") against Billy Arnold d/b/a Ranger Oil & Gas ("ROG") and DSCH Capital Partners, L.L.C. d/b/a Far West Capital ("DSCH"). Chesapeake settled with DSCH, and the Court presided over a non-jury trial on November 22, 2010 in order to resolve Chesapeake's interpleader action and a counterclaim by ROG. After the evidence concluded, the Parties rested, and the Court heard the arguments of counsel. Having considered the testimony of the witnesses, the exhibits in evidence, the arguments and briefs of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law.[1]

### Findings of Fact

(1)     Chesapeake is in the business of exploring for oil and natural gas. In its operations, Chesapeake utilizes independent contractors for various oilfield services.

(2)     ROG is in the business of providing oilfield services, including site preparation work and facility construction. The owners of ROG are Gregg Coker ("Coker") and Billy Arnold ("Arnold").

---

1. To the extent that any conclusion of law is more properly characterized as a finding of fact, and vice versa, the Court adopts it as such.

(3)     ROG worked as an independent contractor for Chesapeake pursuant to a Master Services Agreement (MSA) (Pl. Trial Ex. 10). The MSA contained a conflict of interest provision. (*Id.* ¶ 2.6.)

(4)     Coker "kept the books" for ROG and was responsible for all billing. Arnold was responsible for the actual site work, and he reported to Coker what work ROG performed.

(5)     At the same time Coker was running the business end of ROG, Coker was also a contract field representative for Chesapeake and was responsible for obtaining and recommending bids, as well as certifying that work had been completed.

(6)     Chesapeake was unaware that Coker had any financial interest in ROG.

(7)     Arnold was unaware that Coker was secretly withdrawing thousands of dollars in funds from ROG's bank accounts.

(8)     By summer 2008, ROG began having trouble paying its bills.

(9)     On August 1, 2008, ROG was sold to Outlaw Services, Inc. and was renamed Ranger Field Services (RFS). Coker handled the negotiation for the terms of the sale.

(10)     Effective August 1, 2008, RFS agreed to pay all labor, materials, equipment, and third-party subcontractor expenses required to perform the Chesapeake site preparation work. In return, ROG agreed that RFS would have the right to invoice Chesapeake and receive payments for that work.

(11)     RFS worked as an independent contractor for Chesapeake pursuant to an MSA that was virtually identical to ROG's MSA. (Pl. Trial Ex. 11.) Pursuant to the MSA, all site preparation work for Chesapeake was performed under the auspices of RFS, and RFS invoiced Chesapeake and was paid directly for that work.

(12)    Between August 1, 2008 and January 31, 2009, Arnold and other ROG personnel were paid as employees by RFS.

(13)    In October 2008, Chesapeake was notified that RFS had assigned its right to payment for certain invoices to DSCH, a factoring company. Chesapeake paid several RFS invoices directly to DSCH pursuant to the factoring arrangement.

(14)    When Chesapeake learned that RFS had invoiced Chesapeake for work performed by a subcontractor that had filed a lien affidavit, Chesapeake paid the subcontractor directly to obtain a release of the lien.

(15)    When Chesapeake discovered that work for certain wells covered by RFS invoices had also been billed by ROG, Chesapeake stopped payments to DSCH and began auditing the invoices.

(16)    After Chesapeake stopped payments, DSCH filed suit against Chesapeake in Texas state court for certain unpaid RFS invoices totaling $220,000.

(17)    In the fall of 2008, Arnold began receiving phone calls from RFS vendors stating that they had not been paid. Meanwhile, RFS owners and managers were renting private jets to take trips to Las Vegas and other locations. By late December 2008, RFS had no more money or credit, and vendors began picking up their equipment.

(18)    In January 2009, Arnold realized that RFS would not complete work on its contracts with Chesapeake. As a result, Arnold restarted ROG, assumed responsibility for the completion of several well locations, and completed the work. However, Arnold and other ROG employees remained on RFS payroll through January 31, 2009.

(19)    Sometime during the summer of 2009, Arnold spoke with Linda Havrilla ("Havrilla"), Chesapeake's Director of Internal Audit, on the phone. Havrilla testified that during

this conversation, Arnold stated that he was entitled to part of the $220,000 claimed by DSCH for work that ROG completed at the Pridgen Well location. (Trial Tr. 34:4-11; 109:3-9.)

(20)   On July 14, 2009, Chesapeake removed the case to this Court and filed an interpleader action, depositing the total amount of DSCH's claim into the registry of the Court and joining both RFS and ROG as defendants-in-interpleader.

(21)   Chesapeake settled DSCH's claims for the total sum of $137,000, which was disbursed from the money deposited into the registry of the Court.

(22)   On October 12, 2009, Arnold met with Havrilla and claimed that Chesapeake owed ROG approximately $308,000. Havrilla testified that Chesapeake had a record of $166,000 in its general ledger at that time, and that she told Arnold she could not pay any invoices without backup documentation. (Trial Tr. 35:3-11; 37:8-17.)

(23)   On March 9, 2010, ROG filed a counter-claim in this action, stating that it was owed $308,000 for work directly contracted with Chesapeake.

(24)   In April 2010, Coker sent Chesapeake a box of invoices that he claimed were owed to ROG totaling approximately $250,000, some of which had supporting field tickets. Most of the invoices covered work done in the first few months of 2009 and had not previously been submitted with any field tickets or other supporting detail.

(25)   As of April 2010, Arnold and Coker had presented Chesapeake with invoices totaling $565,143.59. (Pl. Trial Ex. 1.)

(26)   Havrilla testified that after receiving the invoices from Arnold and Coker in the spring of 2010, she audited all payments from Chesapeake to both RFS and ROG going back to the inception of their relationship with Chesapeake. (Trial Tr. 43:6-15.)

(27)     Havrilla testified that the audit revealed that Chesapeake paid ROG more than $1.2 million over that time and that she found many examples of fraudulent charges. (Trial Tr. 71:9-15.)

(28)     Havrilla testified that ROG had charged sales tax to Chesapeake for untaxable services, including bid work, reclamation work, and non-bonded, unlicensed gate guards. (Trial Tr. 55:1-13; 70:1-22; 71:19-23.) Chesapeake presented further evidence that it paid ROG $50,190 in improperly charged sales tax. (Pl. Trial Ex. 3.)

(29)     Havrilla testified that some invoices and work tickets submitted to Chesapeake contained material alterations. In other instances, the same work ticket was used to back up five or six different invoices. (Trial Tr. 47:15—54:22; 74:1—75:6.) Chesapeake presented further evidence of $347,224 in altered invoices, work tickets, or other backup documentation. (Pl. Trial Ex. 4.)

(30)     Havrilla testified that, on several occasions, both RFS and ROG submitted duplicate invoices for the same site work. (Trial Tr. 42:21-23.)

(31)     Arnold did not prepare any of the invoices that were submitted to Chesapeake on behalf of RFS or ROG. When confronted with the invoices for the first time, Arnold acknowledged that some invoices and work tickets were altered and that double billing had occurred. (Trial Tr. 164:19-23; 179:12-24)

(32)     ROG conceded at trial that it is not entitled to recover for work done when Arnold and other ROG personnel were paid as employees by RFS (Trial Tr. 79:22-25), which the Court finds to be August 1, 2008 to January 31, 2009.

(33)     The total amount of ROG invoices falling within the August 1, 2008 to January 31, 2009 period is $379,808.51.

(34)    The total amount of ROG invoices falling outside the August 1, 2008 to January 31, 2009 period is $185,335.08.

(35)    With respect to invoices dated after January 31, 2009, ROG seeks payment of $41,135 for an invoice dated February 7, 2009 to build the Pridgen Well location. (Def. Trial Ex. 1 at 41.) Chesapeake has presented evidence that construction of the Pridgen Well location occurred shortly before January 4, 2009. (Dkt. No. 68, Ex. B at 1.)

(36)    ROG also seeks payment of $18,402 for an invoice dated March 19, 2009 for work allegedly performed on the Bauer-Smith #1 Well. (Def. Trial Ex. 1 at 82.) Chesapeake has presented evidence that it already paid RFS for that job in December 2008. (Dkt. No. 68, Ex. B at 17—21.)

(37)    Chesapeake has presented evidence that on August 8, 2007, while Arnold was an employee of Strike Construction Company ("Strike"), Arnold signed a bid on behalf of Strike for site construction for the Milner #1 Well. (Dkt. No. 68, Ex. B at 4.) Coker noted his field approval on Strike's September 17, 2007 invoice for $78,770.61, which Chesapeake paid. (*Id.* at 2—3.) Several months later, after Coker and Arnold formed ROG, ROG invoiced Chesapeake and was paid $52,405 for the same work. (*Id.* at 5—6.)

(38)    Chesapeake has presented further evidence that ROG invoiced Chesapeake and was paid more than $63,000 for work performed during the August 1, 2008 through January 31, 2009 period, for which Chesapeake had already paid RFS. (Dkt. No. 68, Ex. B at 8—56.)

## Conclusions of Law

### I.  Jurisdiction

(1)    This Court has subject matter jurisdiction of Chesapeake's interpleader action against ROG and over ROG's counterclaims pursuant to 28 U.S.C. § 1332 because complete

diversity of citizenship exists between the Parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

## II. Chesapeake's Interpleader Action

(2)     ROG has conceded that it has no right to the interpleaded funds. Thus, ROG is left with its counterclaim.

## III. ROG's Counterclaim

(3)     At trial, ROG presented invoices totaling $283,726 that it claims it is owed by Chesapeake. (Def. Trial Ex. 1.)

(4)     ROG is not entitled to $25,859 claimed for work performed in January 2009, when Arnold and other ROG personnel were paid employees of RFS.

(5)     ROG is not entitled to $41,135 claimed to build the Pridgen Well in December 2008/January 2009, when Arnold and other ROG personnel were paid employees of RFS.

(6)     ROG is not entitled to $18,402 claimed for work allegedly performed on the Bauer-Smith #1 Well for which Chesapeake already paid RFS, when Arnold and other ROG personnel were paid employees of RFS.

(7)     ROG is not entitled to $83,596 claimed for invoices Coker submitted in April 2010, for which there was altered or otherwise insufficient supporting backup documentation.

(8)     ROG's counterclaim is also subject to Chesapeake's defenses and offsets.

(9)     Under Texas law, bid work, reclamation work, and non-bonded, unlicensed gate guards are not taxable services. 34 TEX. ADMIN. CODE §§ 3.291, 3.324, 3.333. The amount claimed by ROG should be offset by $50,190 for improperly charged sales tax that Chesapeake previously paid ROG.

(10)    The amount claimed by ROG should be offset by $52,405 for work Strike performed on the Milner #1 Well, for which Chesapeake previously paid both ROG and Strike.

(11)    The amount claimed by ROG should be offset by $ 63,300 for work performed from August 1, 2008 to January 31, 2009, for which Chesapeake previously paid both ROG and RFS.

(12)    ROG cannot recover under its asserted theory of *quantum meruit*, since the total amount of reductions and offsets—$334, 887—exceeds the $283,726 that ROG claims it is owed by Chesapeake.

## Conclusion

For the foregoing reasons, Chesapeake Operating, Inc. is entitled to the remaining funds in the registry of the Court.

Billy Arnold d/b/a Ranger Oil & Gas shall take nothing by his counterclaim against Chesapeake Operating, Inc.

Judgment shall therefore be rendered against Billy Arnold d/b/s Ranger Oil & Gas and in favor of Chesapeake Operating, Inc.

Each Party shall bear its own costs.

It is so **ORDERED**.

**SIGNED** this 28th day of March, 2012.


JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE